**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**


**A.HAK INDUSTRIAL SERVICES BV
and A.HAK INTANK SERVICES, LLC,**

        Plaintiffs,

**v.**                                                   **CIVIL ACTION NO.: 3:11-CV-74
                                                         (JUDGE GROH)**

**TECHCORR USA, LLC,**

        Defendant.


**TECHCORR USA MANAGEMENT, LLC,**

        Plaintiff,

**v.**

**A.HAK INDUSTRIAL SERVICES B.V.;
A.HAK INDUSTRIAL SERVICES US LLC; and
A.HAK INTANK SERVICES, LLC,**

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART MOTION FOR SUMMARY JUDGMENT</u>

Currently pending before the Court are the Motion for Partial Summary Judgment of A.Hak Industrial Services BV ("A.Hak BV") and the Motion for Summary Judgment of A.Hak BV, A.Hak Industrial Services US, LLC, ("A.Hak US") and A.Hak InTank Services LLC ("A.Hak InTank"). ECF 229. For the following reasons, the Court **DENIES** the Motion for Partial Summary Judgment and **GRANTS IN PART** the Motion for Summary Judgment.

# I. Background

This case concerns the sale of certain intellectual property ("IP") rights to robotic tank inspection and cleaning technology from Berkeley Springs Instruments, LLC ("BSI") to A.Hak US.  TechCorr[1] argues that the sale should not have occurred because BSI and its President, Eugene Silverman, granted TechCorr a right of first refusal to the IP in addition to a perpetual license to the associated trademarks.  TechCorr also raises various claims arising from alleged conduct of A.Hak BV, A.Hak US, and A.Hak InTank (collectively "A.Hak") following the disputed sale.  A.Hak denies that TechCorr ever had a right of first refusal and alleges that TechCorr violated the Lanham Act.

## A.    Facts[2]

In 1980, Dr. Eugene B. Silverman invented a robot that inspects aboveground storage tanks.  His invention allows inspection of tanks in service, eliminating the need to drain them for inspection.  In 2000, Silverman's employer, ARD Corporation, established an InTANK® division to commercialize the robotic tank inspection service.  ARD also developed assets for this division, including patents and trademarks for the robot system OTIS® and a non-robotic probe SCAVENGER®.  In 2004, ARD sold the InTANK® assets and trademarked name to a subsidiary of Praxair Corporation, AST Services, LLC.  Silverman then joined Praxair/AST and continued to develop the robotic tank inspection technology.

---

[1] TechCorr refers to TechCorr USA, LLC and TechCorr USA Management, LLC.

[2] The Court notes when a material fact is disputed and considers all inferences drawn from the facts in the light most favorable to TechCorr.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

In 2006, Praxair decided to divest itself of the InTANK® assets and the associated IP. Praxair sought a buyer and began negotiations with TechCorr. TechCorr is a Texas limited liability company that conducts non-destructive testing/quality assurance-quality, including robotic tank-inspection and cleaning services. TechCorr's CEO is Vincent Summa and its chairman is Joseph Summa.

On May 25, 2007, Joseph Summa sent a non-binding letter of intent to Praxair's president. This letter stated that TechCorr sought to purchase "the physical assets for the above ground storage tank inspection business." A.Hak Ex. 2.

On July 12, 2007, Praxair divested itself of the InTANK® division through two transactions. See A.Hak Exs. 3-4. First, AST and TechCorr entered into an Asset Sale and Purchase Agreement. Second, AST and BSI entered into a Transfer Agreement that transferred the IP, including the trademarks, to BSI. TechCorr admits that BSI lawfully acquired the IP but alleges that, before execution of this agreement and as a pre-condition of the closing, BSI gave TechCorr a right of first refusal regarding any future sale of the IP by BSI. On July 12, 2007, Silverman sent a letter to Joseph Summa that provided:

> On July 12, 2007, AST Services, LLC . . . completed the legal transfer of the In-Tank® Robotic Intellectual Property in the form of patents, registered trademarks and related proprietary know-how etc. to [BSI].
>
> As you have requested, the purpose of this letter is to verify and confirm that [TechCorr's] acquisition of the AST Services, LLC In-Tank® Robotic systems, spare parts and other support equipment will be supported by Eugene Silverman and my company Berkeley Springs Instruments, LLC.
> As evidenced by this letter, Eugene Silverman and my company Berkeley Springs Instruments, LLC grant TechCorr USA, LLC (TechCorr) and its subsidiaries and affiliates a perpetual right to use the Intellectual Property and registered brand name of "In-Tank®" for the "In-Tank® Robotic Assets" being acquired by TechCorr from AST Services, LLC. These assets include but are not limited to several In-Tank® Robotic systems, spare parts and other support equipment.

3

Eugene Silverman and Berkeley Springs Instruments, LLC will further support TechCorr's In-Tank® Robotic Assets under a separate maintenance and technical support agreement.

A.Hak Ex. 5.

The parties to this action agree that, through this letter, Silverman and BSI agreed to support the In-TANK® Robotic Assets that TechCorr purchased from AST and granted TechCorr a license concerning the IP. They dispute the license's scope and relevance.

On February 4, 2010, Vincent Summa emailed Silverman and asked whether BSI was competing in the tank inspection market. A.Hak Ex. 6. Silverman replied that BSI had indeed begun operating an InTANK® division.

After Vincent Summa forwarded Silverman's reply to him, Joseph Summa responded:

FYI as requested is the signed sale contract for the InTank assets along with other important and relevant documents.

Bottom line is he owns the patents and trademark but we have a separate letter agreement attached saying we have "...perpetual right to use the Intellectual Property and registered brand name of 'In-Tank' robotics assets..."

So *we can not stop him from using the name to compete with us*.

Id. (emphasis added).

In May 2010, A.Hak BV's general manager, Johan Robbe, contacted Silverman and expressed interest in acquiring BSI's InTANK® assets. A.Hak BV also provides industrial services but did not have a robotic tank inspection business when Robbe contacted Silverman. Negotiations began, and, on November 4, 2010, A.Hak US, BSI, and Silverman entered into an Asset Purchase Agreement. A.Hak Ex. 8. Under this

agreement. A.Hak US acquired the IP, including the trademarks InTANK®, OTIS®, and SCAVENGER®.

On November 6, 2010, A.Hak BV and Silverman received a letter from TechCorr's counsel which asserted that TechCorr had a right of first refusal on the IP and demanded that A.Hak BV and BSI cease and desist all actions concerning the transaction. Id. That same day, Robbe and Silverman exchanged emails concerning TechCorr's letter. A.Hak Ex. 10.

The parties dispute several facts regarding these events. They disagree about whether TechCorr had a right of first refusal and whether A.Hak knew or should have known about any such right when acquiring the IP. Finally, since the A.Hak/BSI transaction, A.Hak and TechCorr have competed in the robotic tank inspection market. Various disputes have arisen from that competition that have led to additional claims in this case.

### B. Procedural History

In light of these events, A.Hak BV and A.Hak InTank filed a complaint against TechCorr USA Management, LLC in this Court on August 31, 2011 and amended their complaint on September 28, 2011. The amended complaint raised four claims: (1) trademark infringement under the Lanham Act; (2) unfair competition under the Lanham Act; (3) state dilution; and (4) common law trademark infringement. The last two claims were later dropped, leaving only the Lanham Act claims.

Meanwhile, TechCorr filed a complaint against A.Hak, Silverman, and BSI in Texas state court on September 16, 2011. The case was removed to the Southern District of Texas on October 17, 2011. TechCorr's initial complaint raised three claims: breach of contract, tortious interference, and promissory estoppel. On August 1, 2012, TechCorr

filed its first amended complaint, which added a Lanham Act claim and a declaratory judgment claim. On October 4, 2012, TechCorr amended its complaint a second time, this time adding a trade secret misappropriation claim and an assisting and participating claim. These claims arise from A.Hak's alleged interactions with TechCorr's former VP for the Eastern Hemisphere, Gary Penney.

After each lawsuit was filed, the parties extensively litigated personal jurisdiction in each case. During that period, on January 9, 2013, TechCorr filed two counterclaims in the case before this Court, a claim seeking cancellation of the trademarks and a claim for attorney's fees. Then, the personal jurisdiction issue was resolved on June 11, 2013 when the Texas case was transferred to this Court. The Court consolidated the cases on August 20, 2013.

Following consolidation, TechCorr amended its claims three more times. First, on September 26, 2013, TechCorr filed a first amended answer, counterclaims and third party claims. This filing combined the claims TechCorr raised in the Texas and West Virginia cases and asserted them as counterclaims. TechCorr amended this pleading on January 7, 2014 to add a conspiracy counterclaim, among other things. Then, on March 24, 2014, TechCorr filed its current pleading. This pleading raises the following counterclaims:

- **Count One:** breach of contract against BSI, Silverman, and A.Hak;

- **Count Two:** tortious interference against A.Hak as to TechCorr's (1) alleged right of first refusal; (2) existing or prospective contracts with consumers; and (3) TechCorr's employment contracts or relationships with Mike King, Ron Charles, David McGriff, Jeff Robbins, Gary Penney, and others;

- **Count Three:** promissory estoppel against BSI and Silverman;

- **Count Four:** false and misleading advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1), against BSI, Silverman, and A.Hak;

6

- **Count Five:** declaratory judgment that (1) the right of first refusal, the perpetual license, and the support obligations are valid and enforceable; (2) the sale of the IP to A.Hak BV is void; and (3) the acts complained of constitute tortious interference and Lanham Act violations against BSI, Silverman, and A.Hak;

- **Count Six:** trade secret misappropriation against A.Hak;

- **Count Seven:** aiding and abetting Gary Penney's alleged breach of his fiduciary duties to TechCorr against BSI, Silverman, and A.Hak;

- **Count Eight:** cancellation of trademark registrations under the Lanham Act, 15 U.S.C. § 1119, against A.Hak; and

- **Count Nine:** conspiracy against BSI, Silverman, and A.Hak.

On July 15, 2014, A.Hak filed the instant motion for partial summary judgment and a motion for summary judgment. In its motion for partial summary judgment, A.Hak seeks judgment in its favor on liability as to its Lanham Act claims. In the motion for summary judgment, A.Hak seeks summary judgment on all of TechCorr's claims.[3]

## II. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, the Court must conduct "the threshold inquiry of determining whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly

---

[3] BSI and Silverman also moved for summary judgment on July 15, 2014 but thereafter filed a notice of partial settlement. Per this notice, the Court dismissed all claims asserted between TechCorr, Silverman, and BSI with prejudice.

can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Id.</u> at 250.

The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 586. That is, once the movant has met its burden to show an absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial. Fed. R. Civ. P. 56; <u>Celotex Corp.</u>, 477 U.S. at 323-25; <u>Anderson</u>, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Anderson</u>, 477 U.S. at 249 (citations omitted). A motion for summary judgment should be denied "if the evidence is such that conflicting inferences may be drawn therefrom, or if reasonable men might reach different conclusions." <u>Phoenix Savs. & Loan, Inc. v. Aetna Cas. & Sur. Co.</u>, 381 F.2d 245, 249 (4th Cir. 1967); <u>see also</u> <u>id.</u> at 253 (noting that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

### III. Discussion

### A.    Motion for Partial Summary Judgment

A.Hak claims Lanham Act trademark infringement under 15 U.S.C. § 1114 and unfair competition under 15 U.S.C. § 1125(a). The unfair competition claim alleges false advertising and false designation of origin by TechCorr.[4]

---

[4] TechCorr contends that damages and liability must be determined together. District courts, however, may properly determine liability under the Lanham Act on summary judgment. <u>See, e.g.</u>, <u>Microsoft Corp. v. Grey Computer</u>, 910 F. Supp. 1077, 1086 (D. Md. 1995).

As a threshold matter, TechCorr argues A.Hak's admission of the existence of a license to TechCorr renders A.Hak's complaint defective because A.Hak's pleadings state that TechCorr lacks permission to use the trademarks.

A.Hak's complaint alleges Lanham Act claims for trademark infringement, false designation of origin, and false advertising based on allegations concerning TechCorr's use of the trademarks. The fact that A.Hak admits TechCorr has a license does not negate A.Hak's complaint or change the case it pleaded. Rather, A.Hak argues, despite that license, it is entitled to judgment. Moreover, this contention assumes that the Federal Rules of Civil Procedure obligate A.Hak to plead TechCorr's license defense. A.Hak's complaint, however, need only "contain a short and plain statement of the claim showing that [it] is entitled to relief." Fed. R. Civ. P. 8(a)(2). A.Hak has no obligation to address possible affirmative defenses to its claims, including a possible license defense. Indeed, TechCorr, not A.Hak, needed to state "any avoidance or affirmative defense." Fed. R. Civ. P. 8(c)(1). Accordingly, A.Hak met its pleading obligations under the Federal Rules of Civil Procedure.[5] <u>See</u> <u>Onuoha v. Grafton Sch., Inc.</u>, 182 F. Supp. 2d 473, 481 (D. Md.

---

[5]    In addition, the sole case that TechCorr relies on for this argument, <u>Gilbane Building Co. v. Federal Reserve Bank of Richmond</u>, 80 F.3d 895 (4th Cir. 1996), does not support its position. In <u>Gilbane</u>, the Fourth Circuit considered whether a district court abused its discretion by allowing a party to amend its pleadings after trial to add a claim. 80 F.3d at 899. The Fourth Circuit explained that Federal Rule of Civil Procedure 54(c) governed the issue rather than Federal Rule of Civil Procedure 15(b) by stating, in pertinent part:

> The "notice-pleading" scheme of the Rules has eliminated code pleading's formalistic, purely factual approach. Courts now deem a claim sufficient if it contains a "'short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." <u>Conley v. Gibson</u>, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957) (quoting Rule 8(a)(2)). Nevertheless, despite the more forgiving pleading standards, the essence of a claim remains its factual elements. Thus, under Rule 8(a)(2), a "statement of the claim" is sufficient "so long as a plaintiff colorably states facts which, if proven, would entitle him to relief," and the claimant "need not set forth any theory or demand any particular relief for the court will award appropriate relief if the plaintiff is entitled to it on any theory."

2002) (rejecting defendant's argument against summary judgment because complaint met Rule 8's pleading standard).  The Court therefore will now consider this motion.

### 1.    Trademark Infringement

The Court first turns to A.Hak's trademark infringement claim.  The parties disagree on the elements of this claim.  A.Hak relies on <u>PETA v. Doughney</u>, 263 F.3d 359 (4th Cir. 2001) for the elements while TechCorr cites <u>Rosetta Stone Ltd. v. Google, Inc.</u>, 676 F.3d 144 (4th Cir. 2012).  The elements pronounced in <u>PETA</u> differ from those of <u>Rosetta Stone</u> in that <u>Rosetta Stone</u> states that a defendant must have used the trademark without the plaintiff's authorization.  <u>Compare</u> <u>Rosetta Stone Ltd.</u>, 676 F.3d at 152, <u>with</u> <u>PETA</u>, 263 F.3d at 364.  <u>Rosetta Stone</u>, the most recent decision, controls the Court's analysis.  <u>See</u> <u>2 Hounds Design, Inc. v. Brezinski</u>, Civil Action No. 3:13-CV-101-RJC-DCK, 2014 WL 4407015, at *10 (W.D.N.C. Sept. 8, 2014) (citing <u>Rosetta Stone</u> for trademark infringement claim's elements).

Under <u>Rosetta Stone</u>, a plaintiff must prove four elements to establish trademark infringement under the Lanham Act:

---

> Rule 15(b) is an exception to the general rules of pleading.  As its heading suggests, it is designed to allow amendment of a pleading when the facts proven at trial differ from those alleged in the complaint, and thus support a cause of action that the claimant did not plead. Because notice to the defendant of the allegations to be proven is essential to sustaining a cause of action, Rule 15(b) applies only when the defendant has consented to trial of the non-pled factual issues and will not be prejudiced by amendment of the pleadings to include them.

<u>Id.</u> at 900-01 (citations omitted).  TechCorr quotes two phrases from this portion of <u>Gilbane</u>: "despite the more forgiving pleading standards, the essence of a claim remains its factual elements" and "notice to the defendant of the allegations to be proven is essential to sustaining a cause of action."  <u>Id.</u>  Viewing these quotations in context, they do not support TechCorr's argument.  The first statement is part of a broad discussion of the pleading standard of Rule 8(a)(2), which the Court has addressed.  The second statement arises in the Fourth Circuit's explanation that Rule 15(b) applies when evidence adduced at trial supports a claim that a plaintiff did not plead at all.  This principle is inapplicable because this case has not advanced to trial.  Even so, because A.Hak seeks summary judgment on the same Lanham Act claims it pleaded, A.Hak is not presenting an entirely different cause of action that could possibly trigger Rule 15(b).  <u>See</u> Wright et al., Federal Practice and Procedure § 1491 (3d ed. 2014).  Thus, <u>Gilbane</u> is inapposite.

(1) that it owns a valid mark; (2) that the defendant used the mark "in commerce" and without plaintiff's authorization; (3) that the defendant used the mark (or an imitation of it) "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (4) that the defendant's use of the mark is likely to confuse consumers.

676 F.3d at 152 (citing 15 U.S.C. § 1114(a)).

TechCorr argues its license is a complete defense to this claim. A.Hak concedes operating within the scope of a license can be a defense, but maintains that TechCorr exceeded the license's scope in three ways.[6]

First, A.Hak argues that TechCorr made false or misleading claims that indicate TechCorr owns the trademarks. It bases this contention on the following evidence:

- References on TechCorr's website to "the TechCorr inTANK® system," "TechCorr's Scavenger XT® 2000," and OTIS®. A.Hak Ex. 17.

- Headline of a July 2009 press release - "TechCorr USA, LLC Announces Completion of Multi Tank In Service Inspection with New Robot Added to the Wholy [sic] Owned 'In-Tank' Inspection Robotics Program." Id.

- Statements made in a customer proposal issued to the Tennessee Valley Authority ("TVA") on June 7, 2012, such as "TechCorr's InTANK In-Service Inspection services." A.Hak Ex. 18.

---

[6] A.Hak also contends that TechCorr knew its actions were improper based on statements made by two TechCorr employees. The alleged belief of TechCorr's employees that TechCorr exceeded the scope of the license has no bearing on this issue.

In addition, for the first time in its reply, A.Hak introduces evidence of another allegedly false statement to support its Lanham Act claims: an email where Joseph Summa states, "We have cleaned and inspected over 5,000 tanks using this robotic inspection technology and we are the only provider." A.Hak Ex. 45. Because TechCorr has not had the opportunity to respond to this new evidence, the Court does not consider whether it is actionable. See Baugh v. City of Milwaukee, 823 F. Supp. 1452, 1457 (E.D. Wis. 1993) ("Where new evidence is presented in either a party's reply brief or affidavit in further support of its summary judgment motion, the district court should permit the nonmoving party to respond to the new matters prior to disposition of the motion, or else strike that new evidence." (internal citation omitted)).

TechCorr responds the law only requires that it display the trademarks and its name, which is all TechCorr did, and, moreover, these statements refer to the physical assets it purchased from AST.

Second, A.Hak avers that TechCorr stated or suggested it purchased the trademarks and all associated assets based on the following evidence:

- Statement in a December 9, 2010 email from Vincent Summa to SBG-Systems concerning quotes for upgrades to TechCorr's robotic tank inspection equipment. Summa states in the email: "Attached is a basic presentation on the robotic technology. This technology was originally designed back in the late 80's early 90's. We acquired the company in 2007. The electronics, pingers, sonar etc have not been upgraded very much since the early 90's. We are basically planning to overhaul the technology and are looking at options." A.Hak claims TechCorr's statement "We acquired the company in 2007" suggests TechCorr bought the trademarks. A.Hak Ex. 26.

- Statement of TechCorr employee Jeff Robbins in a March 1, 2010 email to Hariyo Wiryono. Robbins made the statement in response to a question from BP Micas relayed by Wiryono. Wiryono asked: "[W]hat is the relation between 'inTANK' and 'TechCorr'?" Robbins responded: "TechCorr purchased the In Tank company 3 or 4 years ago." A.Hak Ex. 35.

- Statement from TechCorr employee Larry Peterson in a March 1, 2010 email to an employee for a company involved in tanking operations. Peterson emailed the employee concerning TechCorr's tank inspection services after stopping at one of the organization's locations. Peterson responded by stating, among other things: "I have had some experience with INTank when they were with Praxair, but I wasn't aware that they had moved over to TechCorr." Peterson responded by stating, in part: "To answer your question, we purchased the whole InTANK operation from Praxair about two years ago and we've been busy ever since." A.Hak Ex. 28.

TechCorr contests this evidence on four grounds. First, it argues that Summa's and Robbins' statements are not actionable because SBQ and Wiryono were not customers. Second, TechCorr asserts Robbins or Peterson truthfully stated that TechCorr purchased the InTANK® operation and assets from AST and possesses a license to use the marks concerning those assets. Third, TechCorr avers that it acted within its license for any

statements that use the trademarks.  Finally, TechCorr argues that, even if Peterson was mistaken about the wholeness of TechCorr's purchase, his statement was not material.

A.Hak maintains TechCorr's claim that its OTIS® robot was "intrinsically safe" misled customers because it lacked the necessary third-party certification.  In support, A.Hak points to the following evidence:

- Deposition testimony of Vincent Summa:

  | [Counsel:] | What was the fuss that you're describing A.Hak made? |
  |---|---|
  | [Summa:] | It was specifically about TechCorr's equipment not being intrinsically safe or explosion proof. |
  | [Counsel:] | Which is true, right? |
  | [Summa:] | It's true. |
  | [Counsel:] | The equipment is not intrinsically safe? |
  | [Summa:] | We have one probe that is, and the others are not. |
  | [Counsel:] | But the probe is not working? |
  | [Summa:] | Correct.  Because Gene wouldn't fix it. |

  Vincent Summa Dep. 131-32, A.Hak. Ex. 11.

- Reference in a PowerPoint presentation to "OTIS Intrinsically-Safe Robot." A.Hak Ex. 37.

- Editing suggestion of TechCorr employee Ron Charles made on a working FAQ document.  The FAQ question is: "Does OTIS meet plant safety requirements?"  Charles suggested that the response should be: "Yes. OTIS is designed as an intrinsically 'NOT' safe system and has met all of the safety requirements at each facility in which it has worked."  It is undisputed that Charles suggested adding the word "NOT" to this answer and that TechCorr issued the FAQ without adopting his recommendation. A.Hak Ex. 31.

- Statement of Gary Penney to another TechCorr employee inquiring into intrinsically safe certification for TechCorr's equipment when a customer raised the issue. Penney stated:

> We have each component certified - it is kind of a smoke screen as by the time they get through checking they normally give up on every detail. I will ask David if he has any more recent certificates. You can tell them that we configure the robot for each tank and therefore the certification will var - hence we certify each part.

A.Hak Ex. 38.

TechCorr argues these statements were not false because the Asset Sale and Purchase Agreement and Silverman's deposition testimony show it purchased an intrinsically safe robot from AST. This robot, TechCorr alleges, appears on Schedule 1 of the Asset Sale and Purchase Agreement as the following assets with "IS" meaning "intrinsically safe": (1) CB-6 - IS Probe; (2) OTIS 5 (IS) - G-Otis Robot; and (3) G-OTIS Probe - IS Probe. A.Hak Ex. 3 at 83. TechCorr then points to Silverman's testimony that OTIS-G is an intrinsically safe robot that "was designed as an intrinsically safe system." Eugene Silverman Dep. 107-08, TechCorr Ex. 3. TechCorr also addresses Charles' and Penney's statements. It maintains that TechCorr properly did not include Charles' suggestion because it had an intrinsically safe OTIS robot. As for Penney's statement, TechCorr claims that each component of the robot is certified intrinsically safe.

If "a trademark holder has authorized another to use its mark, there can be no likelihood of confusion and no violation of the Lanham Act if the alleged infringer uses the mark as authorized." 2 Hounds Design, Inc., 2014 WL 4407015, at *10 (citing Segal v. Geisha NYC LLC, 517 F.3d 501 (7th Cir. 2008)). "A use of a trademark properly may display only the licensed mark and the name of the licensee." Gen. Motors Corp. v. Gibson Chem. & Oil Corp., 786 F.2d 105, 110 (2d Cir. 1986). However, "[a] use by a

licensee which is outside of the scope of the license is both trademark infringement and breach of contract." Id. (citing Masters v. UHS of Del., 631 F.3d 464 (8th Cir. 2011)). Thus, TechCorr's potential liability for trademark infringement depends on the disputed scope of its license from BSI.

The license states:

> Eugene Silverman and my company Berkeley Springs Instruments, LLC grant TechCorr USA, LLC (TechCorr) and its subsidiaries and affiliates a perpetual right to use the Intellectual Property and registered brand name of "In-Tank®" for the "In-Tank® Robotic Assets" being acquired by TechCorr from AST Services, LLC. These assets include but are not limited to several In-Tank® Robotic systems, spare parts and other support equipment.

Of the evidence offered by A.Hak, TechCorr's website, press release, and proposal to the TVA show how TechCorr used the trademarks.[7] A.Hak and TechCorr conflict over whether the use fits within the scope of the license. A.Hak maintains TechCorr exceeded the license's boundaries by using the marks in a way that indicates TechCorr owns the trademarks. Specifically, A.Hak points to the use of the possessive noun "TechCorr's" before a trademark and "wholly owned" before "'In-Tank' Inspection Robotics Program."

On the other hand, TechCorr asserts the law and its license allow it to use its name and the marks in connection with the assets and "wholly owned" refers only to the physical assets that it purchased from AST. Neither of these interpretations of TechCorr's use of the marks is unreasonable under the terms of the license agreement when viewed in the light most favorable to TechCorr.

Accordingly, the Court denies the motion for partial summary judgment on this claim because genuine issues of material fact exist with respect to TechCorr's use of the

---

[7] The remainder of A.Hak's evidence relates to the false advertising claim rather than the alleged misuse of the trademarks.

trademarks and, thus, summary judgment is inappropriate.  See Pan Am. World Airways, Inc. v. Vetements, Inc., Civil Action No. 08 CIV 5480 RJH, 2010 WL 3632732, at *1 (S.D.N.Y. Sept. 16, 2010) (denying summary judgment on trademark infringement claim brought against licensee where, among other things, there was a genuine dispute concerning whether use of trademarks was made within license agreement).

## 2.    False Designation of Origin

To succeed on its false designation of origin claim, A.Hak must prove five elements:

> (1) that it possesses a mark; (2) that the [opposing party] used the mark; (3) that the [opposing party's] use of the mark occurred 'in commerce'; (4) that the [opposing party] used the mark 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services; and (5) that the [opposing party] used the mark in a manner likely to confuse consumers.

Lamparello v. Falwell, 420 F.3d 309, 313 (4th Cir. 2005) (quoting PETA, 263 F.3d at 364). A.Hak bases this claim on the same evidence it relies on to support its trademark infringement claim.

TechCorr again asserts its license as a defense.  Other Courts have previously recognized that, like a trademark infringement claim, a license can be a defense to a false designation of origin claim.  See, e.g., All Star Championship Racing, Inc. v. O'Reilly Auto. Stores, Inc., 940 F. Supp. 2d 850, 866 (C.D. Ill. 2013) (denying defendant's motion for summary judgment on its false designation of origin claim for period where genuine issue of fact existed as to whether plaintiff had implied license); Chen v. Cayman Arts, Inc., 757 F. Supp. 2d 1294, 1299 (S.D. Fla. 2010) (denying licensee's motion to dismiss licensor's false designation of origin claim based on argument that license authorized its use of trademarks because, among other things, the validity of the licensing agreement was

16

disputed); <u>Video Professor, Inc. v. Amazon.com, Inc.</u>, Civil Action No. 09-CV-636-REB-KLM, 2010 WL 1644630, at *4 (D. Colo. Apr. 21, 2010) (granting summary judgment in licensee's favor on false designation of origin claim brought by licensor because licensee had acted within the scope of the license); <u>Auscape Int'l v. Nat'l Geographic Enters. Inc.</u>, Civil Action No. 02 CIV. 6441 LAK HBP, 2003 WL 23531750, at *12 (S.D.N.Y. July 25, 2003) (stating that, if defendant had a license, it would defeat plaintiff's false designation of origin claim); <u>Bowmar Instrument Corp. v. Cont'l Microsystems, Inc.</u>, 497 F. Supp. 947, 957 (S.D.N.Y. 1980) (finding licensee liable for false designation of origin claim where licensee exceeded scope of license). Thus, since genuine issues of material fact exist as to whether TechCorr exceeded the scope of its license, the Court denies A.Hak's motion for partial summary judgment on the false designation of origin claim.

### 3. False Advertising

A false advertising claim under the Lanham Act requires proof of five elements:

(1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

<u>PBM Prods., LLC v. Mead Johnson & Co.</u>, 639 F.3d 111, 120 (4th Cir. 2011).

A.Hak bases this claim on the same statements and representations it relies on for its other Lanham Act Claims. The evidence falls into the following categories: (1) alleged false statements of ownership of the trademarks based on how TechCorr used the trademarks on its website, in the TVA customer proposal, and in a press release; (2)

17

alleged false assertions that TechCorr owns the trademarks and all associated assets; and (3) alleged false statements that TechCorr has an intrinsically safe OTIS® robot.

### a.    Commercial Advertisement

TechCorr argues that several of the statements were not made to customers and are not actionable.  Specifically, TechCorr argues the email statement of Vincent Summa to SBG-Systems—"We acquired the company in 2007"—and email statement of Jeff Robbins to Hariyo Wiryono—"TechCorr purchased the In Tank company 3 or 4 years ago"—do not support the commercial advertisement element of a false advertising claim.

"Generally, a plaintiff can easily satisfy its burden of proving that the complained-of representation was made in 'commercial advertising or promotion' by pointing to paid advertisements by a commercial defendant on television or radio, or in newspapers or magazines."  Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics, 859 F. Supp. 1521, 1532 (S.D.N.Y. 1994).   With representations outside of traditional commercial advertising media, Courts apply a four-part test promulgated in Gordon & Breach "to determine whether a statement is commercial advertising or promotion."   M-Edge Accessories LLC v. Amazon.com Inc., Civil Action No. MJG-11-3332, 2013 WL 50251, at *6 (D. Md. Jan. 2, 2013) (collecting cases).   A statement or representation represents commercial advertising under the Gordon & Breach test if it is "(1) commercial speech; (2) made by a party in commercial competition with a plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services."  859 F. Supp. at 1535-36.  A representation "need not be made in a 'classic advertising campaign.'"  Id. at 1536.  It "may consist instead of more informal types of 'promotion,'" but "must be disseminated

sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." Id.

In the instant case, Summa made the statement in an attempt to retain SBG-Systems' services, not to influence SBG-Systems to use TechCorr's services. A.Hak produced no contrary evidence. Since SBG-Systems was not an existing or potential customer, this statement cannot support a false advertising claim.

In contrast, Penney's statement could support a false advertising claim even though Wiryono was a vendor rather than the ultimate customer. A statement to a middleman can constitute false advertising because "[t]he Lanham Act does not require allegedly false statements to reach the ultimate consumer before they are actionable." Republic Tobacco, L.P. v. N. Atl. Trading Co., Civil Action No. 98 C 4011, 1999 WL 261712, at *8 (N.D. Ill. Apr. 9, 1999). Thus, this statement constituted commercial advertising.

### b. Falsity

To establish the remainder of the first element, "the contested statement or representation must be either false on its face or, although literally true, likely to mislead and to confuse consumers given the merchandising context." PBM Prods., LLC, 639 F.3d at 120 (quotation marks and citation omitted). If "the advertisement is literally false, a violation may be established without evidence of consumer deception." Id. (quotation marks and citation omitted). In this case, A.Hak argues the statements were literally false. "Whether an advertisement is literally false is an issue of fact." C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare, L.P., 131 F.3d 430, 434 (4th Cir. 1997). When considering "whether an advertisement . . . is literally false, a court must determine,

first, the unambiguous claims made by the advertisement . . . , and second, whether those claims are false." PBM Prods., LLC, 639 F.3d at 120 (citation and quotation marks omitted). "A literally false message may be either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." Scotts Co. v. United Indus. Corp., 315 F.3d 264, 274 (4th Cir. 2002) (citation and quotation marks omitted). In addition, "the falsity must be evident from the face of the ad itself." Millennium Labs., Inc. v. Ameritox, Ltd., 924 F. Supp. 2d 594, 600 (D. Md. 2013). "An advertisement cannot be said to be literally false if the advertising message is ambiguous" in that "it is susceptible to two reasonable readings, one of which is literally true." Id. The Court will now address the statements A.Hak alleges are false according to the above categorization.

### i. Alleged False Statements of Ownership of the Trademarks

A.Hak argues TechCorr falsely claim ownership of the trademarks in the following statements: "the TechCorr inTANK® system," "TechCorr's Scavenger XT® 2000," and OTIS® on TechCorr's website; (2) the press release headline "TechCorr USA, LLC Announces Completion of Multi Tank In Service Inspection with New Robot Added to the Wholy [sic] Owned 'In-Tank' Inspection Robotics Program"; and (3) "TechCorr's InTANK In-Service Inspection services" statement in TVA customer proposal. If these statements fell within the scope of its license, they could not be literally false. Looking at the statements in the light most favorable to TechCorr, a genuine issue of material fact exists as to whether they were literally false. Thus, the Court denies summary judgment on this issue.

### ii. Alleged False Statements Regarding Full Ownership

A.Hak contends the following statements falsely assert TechCorr purchased the marks and all associated assets: (1) email statement of Jeff Robbins - "TechCorr purchased the In Tank company 3 or 4 years ago"; and (2) email statement of Larry Peterson - "[W]e purchased the whole InTANK operation from Praxair about two years ago and we've been busy ever since."

Viewing all of the evidence in the light most favorable to TechCorr, genuine issues of material fact exists on the issue of falsity. Determining falsity hinges on an interpretation of what constitutes "the whole InTANK operation" and "the In Tank company." To A.Hak, these statements go to the full IP and not just the physical assets purchased. In TechCorr's view, the statements refer only to the physical assets. As either interpretation of the statements is reasonable, this dispute presents genuine issues of material fact appropriate only for a jury. See PBM Prods., LLC , 639 F.3d at 120; C.B. Fleet Co., 131 F.3d at 434.

### iii. Alleged False Statement that TechCorr Has an Intrinsically Safe Robot

Finally, A.Hak argues that CorrTech's PowerPoint claim of an "OTIS Intrinsically-Safe Robot" and Penney's statement "We have each component certified" are false.

A.Hak argues TechCorr never had an operational intrinsically safe OTIS robot. TechCorr counters that it purchased an intrinsically safe OTIS robot from AST. Penney's statement is, arguably, ambiguous as to what "each component" and "certified" mean. TechCorr suggests a reasonable interpretation of the statement that would be truthful: each separate component was separately certified as intrinsically safe. Thus, viewing

each statement in the light most favorable to TechCorr, a genuine issue of material fact exists. See C.B. Fleet Co., 131 F.3d at 434.

Having found that A.Hak cannot establish either the commercial advertising or falsity elements for any of the statements identified as a matter of law, the Court denies the motion for partial summary judgment on the false advertising claim in its entirety.

### B.    Motion for Summary Judgment

The Court now turns to A.Hak's motion for summary judgment for various state law claims against it (for which the parties agree Texas law applies). [8]

### 1.    Breach of Contract

TechCorr's breach of contract claim alleges A.Hak breached the license agreement between TechCorr and BSI.  A.Hak argues that it took the IP rights subject to the license and did not assume BSI's obligations under the agreement.

A non-party to a contract cannot be sued for breach of that contract.  See Bernard Johnson, Inc. v. Cont'l Constructors, Inc., 630 S.W.2d 365, 369 (Tex. App. 1982) ("[A] suit for breach of contract may not be maintained against a person who is not a party to the contract, particularly a non-party who is assigned duties by the terms of the contract."); see also Silvas v. Ohio Cas. Ins. Co., Civil Action No. SA-05-CA-0627 XR, 2005 WL 2645015, at *2 (W.D. Tex. Aug. 24, 2005) ("Texas law does not provide a cause of action for breach of contract . . . against a defendant who is not a party to the underlying

---

[8] As a preliminary matter, TechCorr argues that A.Hak has not specifically moved for summary judgment on the tortious inference claims concerning TechCorr's customers and the support obligation, the promissory estoppel claim, the entire declaratory judgment claim, and the vicarious liability claims.  A.Hak properly moved for summary judgment concerning all of TechCorr's claims when it moved "for summary judgment . . . with respect to all claims asserted against" it.

contract."). Here, it is undisputed that BSI and TechCorr entered into the license agreement. <u>See</u> A.Hak Ex. 5. TechCorr points to no evidence showing that BSI transferred any of its duties under the license agreement to A.Hak. Thus, because TechCorr cannot assert a claim against A.Hak for breaching an agreement to which it has never been a party, the Court grants summary judgment in A.Hak's favor on the breach of contract claim.

### 2. Tortious Interference

A.Hak moves for summary judgment on TechCorr's tortious interference claim. This claim avers A.Hak tortiously interfered with the following alleged prospective or existing contracts of TechCorr: (1) right of first refusal; (2) employment contracts or relationships with Gary Penney, Mike King, Ron Charles, David McGriff, Jeff Robbins, and others; and (3) contracts with customers.

The elements of a tortious interference with contract claim differ for existing and prospective contracts. The Supreme Court of Texas "identified the elements of tortious interference with an existing contract as: (1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." <u>Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.</u>, 29 S.W.3d 74, 77 (Tex. 2000). A defendant need not "have actual knowledge of the contract and its terms" for its actions to give rise to a tortious interference claim. <u>Kelly v. Galveston Cnty.</u>, 520 S.W.2d 507, 513 (Tex. App.-Houston [14th Dist] 1975). "It is enough that the defendant had facts from which a reasonable person would conclude the existence of a contract." <u>Id.</u> To prove proximate cause, a plaintiff must prove that "the defendant took an active part in persuading a party

23

to a contract to breach it." <u>M-I LLC v. Stelly</u>, 733 F. Supp. 2d 759, 775 (S.D. Tex. 2010) (citation and quotation marks omitted).  The mere entry "into a contract with a party with the knowledge of that party's contractual obligations to someone else is not the same as inducing a breach." <u>Id.</u> (citation and quotation marks omitted).  Thus, "[i]t is necessary that there be some act of interference or of persuading a party to breach, for example by offering better terms or other incentives, for tort liability to arise." <u>Id.</u> (citation and quotation marks omitted).

To succeed on a tortious interference with prospective contract claim under Texas law, a plaintiff must establish:

> (1) a reasonable probability that the parties would have entered into a business relationship; (2) an intentional, malicious intervention or an independently tortious or unlawful act performed by the defendant with a conscious desire to prevent the relationship from occurring or with knowledge that the interference was certain or substantially likely to occur as a result of its conduct; (3) a lack of privilege or justification for the defendant's actions; and (4) actual harm or damages suffered by the plaintiff as a result of the defendant's interference, i.e., that the defendant's actions *prevented the relationship from occurring.*

<u>Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.</u>, 219 S.W.3d 563, 590 (Tex. App.-Austin 2007).  A plaintiff need not "prove that the contract would have certainly been made but for the interference; it must be reasonably probable, considering all of the facts and circumstances attendant to the transaction." <u>Hill v. Heritage Res., Inc.</u>, 964 S.W.2d 89, 109 (Tex. App.-El Paso 1997) (citation and quotation marks omitted).  However, "[m]ore than mere negotiations must have taken place." <u>Id.</u>

### a.    Right of First Refusal

The right of first refusal tortious interference claim concerns an existing contract.

A.Hak seeks judgment on this claim on three grounds: (1) insufficient evidence showing

24

the right of first refusal existed; (2) if the right existed, TechCorr waived it; and (3) if the right existed and TechCorr did not waive it, A.Hak lacked knowledge of the right of refusal before purchasing the IP.

No dispute exists that A.Hak lacked knowledge of the alleged right of refusal before the A.Hak/BSI transaction closed on November 4, 2010. A.Hak avers it only received notice of the alleged right of first refusal after the fact through TechCorr's November 6, 2010 letter. TechCorr does not argue that A.Hak knew or should have known of its alleged right of first refusal before November 6, 2010.

Instead, TechCorr argues that A.Hak interfered with its right of first refusal because the sale was not fully consummated when it received the November 6, 2010 letter. TechCorr supports this contention with two pieces of evidence. First, TechCorr argues that the A.Hak/BSI agreement's provisions indicate the parties needed to do more to finalize the deal. It points out that the agreement states closing "shall take place contemporaneously with the execution and delivery of this Agreement on the Closing Date, or on such other date as the parties may agree." A.Hak Ex. 8 at 20. TechCorr argues that, in light of this provision, closing could not have occurred on November 4 because the agreement states it "shall become effective [when] all the other transfers and deliveries provided for in Article 7 have also been consummated" and no evidence shows the deliveries were made by November 4. Id. Second, TechCorr avers two statements made in emails between Silverman and Robbe on November 6, 2010 show that the deal was not fully consummated on November 4. In the emails, Robbe states to Silverman: "The money has been transferred to the ESCROW account, we propose to leave the money in that account, *till the issue with the eventual 'Right of first Refusal' has been*

*cleared*" and "I think the best is to postpone the implementation of the Transaction, until that is cleared. So basically, we freeze the deal for a short period." A.Hak Ex. 10 (emphasis added). Silverman responds: "I personally agree with your assessment and your plan." Id.

TechCorr argues that portions of Silverman's and Robbe's depositions where it confronted Silverman and Robbe with this email exchange show the transaction was not closed on November 4 and that the Right of Refusal was known to the parties.

In the cited portion of Silverman's deposition, Silverman wrote: "The deal was closed on the 4th of November. This was, I remember this was sort of a professional courtesy on my part to get this sorted out if there was any ambiguity. I had developed a great relationship with A.Hak and I had to live with that relationship for some time to come and I wanted this to be settled before we went any further." Silverman Dep. 83.

As for the cited segment of Robbe's deposition, the following portions address this issue:

> [Counsel:] And then you, A. Hak and Dr Silverman, agree to put the deal on hold essentially until the issue with TechCorr is resolved?
>
> [Robbe:] No.
>
> . . .
>
> [Counsel:] So then what?
>
> [Robbe:] That we had a better feeling understanding about a potential right of first refusal, not to solve the tech issue because the deal was simple. What we said internally, there is a letter from you claiming that, let's hold for the moment, figure out if that is the case, and we thought it was not and we continued.
>
> . . .

[Robbe:]  As I recall a substantial amount of money was paid and another amount was still outstanding waiting for whatever it was. And if it would have appeared to us that this right of first refusal was one hundred percent, if it would have been on the table signed and we would have a lawyer look at that and say this thing exists, then we would have taken actions to deem so and say --

[Counsel:] The deal's off?

[Robbe:] The deal's off or whatever, yes.

[Counsel:]  Ultimately did the deal get funded?

[Robbe:] Get funded?

[Counsel:]  Was the money ultimately released to BSI?

[Robbe:] Yes, it was.

[Counsel:]  Do you recall when roughly?

[Robbe:]  No, but the same year, so it was November 4th as I recall.

Johan Robbe Dep. 102-05, TechCorr Ex. 2.

A genuine dispute of material fact exists as to whether A.Hak had the requisite knowledge of the alleged right of first refusal when it entered into the agreement with BSI on November 4, 2010.  See Kelly, 520 S.W.2d at 513.  The evidence offered by TechCorr raises a genuine dispute of material fact as to when A.Hak and BSI finalized the agreement.  In the emails, Robbe and Silverman agree to "postpone the implementation" of the deal "for a short period."   A reasonable juror could view a decision to delay implementing an agreement as indicating the deal was not closed on November 4.  Silverman admitted the decision to delay implementation was "a professional courtesy."  Robbe testified that the deal was put on "hold" and was set "to continue" after evaluation of the right of first refusal issue.  He further stated that all funds due under the agreement

were transferred on November 4, the same day it was signed. Viewed in the light most favorable to TechCorr, this evidence shows that A.Hak and BSI did not close the deal on November 4. Rather, they delayed its implementation in light of the letter from TechCorr and could have undone the agreement if they so chose expressly because of concerns with the right of refusal issue. Therefore, the Court denies summary judgment on this claim.

### b. Employment Contracts or Relationships

The next tortious interference claim alleges A.Hak interfered with TechCorr's contracts or employment relationships with Gary Penney, Mike King, Ron Charles, David McGriff, Jeff Robbins, and others. A.Hak seeks summary judgment on this entire claim

### i. Mike King, Ron Charles, David McGriff, Jeff Robbins, and Others

A.Hak argues it did not tortiously interference with TechCorr's at-will employment relationships with Mike King, Ron Charles, David McGriff, and Jeff Robbins. A.Hak also argues, in his deposition, Vincent Summa could not identify any actions A.Hak took to interfere with their employment.

Texas law recognizes a claim for tortious interference with an at-will employment relationship. See Sterner v. Marathon Oil Co., 767 S.W.2d 686, 689 (Tex. 1989) (holding "the terminable-at-will status of a contract is no defense to an action for tortious interference with its performance"). Such a claim, however, "cannot be premised merely on the hiring of an at-will employee, without more." Lazer Spot, Inc. v. Hiring Partners, Inc., 387 S.W.3d 40, 53 (Tex. App.-Texarkana 2012). Here, in his deposition, Vincent Summa did not identify any action that A.Hak took beyond the mere hiring to interfere

28

with TechCorr's at-will employment relationship with the individuals at issue. <u>See</u> Vincent Summa Dep. 134-38. TechCorr does not offer any contrary evidence to demonstrate a genuine issue of material fact. Thus, the Court grants summary judgment in A.Hak's favor as to the tortious interference claim concerning Mike King, Ron Charles, David McGriff, and Jeff Robbins.

Further, although TechCorr alleges A.Hak interfered with additional employees, TechCorr has neither identified any such individuals beyond those named in its pleading nor produced any evidence to show a genuine issue of fact with respect to the unnamed employees. The Court therefore grants summary judgment with respect to TechCorr's claim with regard to alleged unnamed employees.

### ii.     Gary Penney

Before discussing the tortious interference claim concerning Gary Penney, the Court reviews the following undisputed facts concerning Penney's interactions with A.Hak.

Penney had an employment contract with TechCorr that included a non-compete clause. In mid-2012, Penney was working for TechCorr and contacted Robbe expressing his desire to join A.Hak. Penney and Robbe met for the first time in April or May of 2012. Robbe Dep. 129-30. They continued to communicate over the subsequent months. Penney and Robbe communicated on several occasions via email with Penney using the email address of a fictitious "James Gordon" at gordon.jg.james@gmail.com. Robbe Dep. 134-35; TechCorr Exs. 10-13, 15-18, 20. During these discussions, Penney gave Robbe information on two pending proposals for TechCorr customers in the United Arab Emirates, Abu Dhabi Marine Operating Company ("ADMA") and Zakum Oil Development

Company ("ZADCO"). Robbe Dep. 156. This information included scope of work, cost estimates, and price. Id. at 157-59. In his deposition, Robbe testified that A.Hak did not use this information. Id. at 157.

On August 4, 2012, Penney emailed Robbe, stating: "I had some good opportunities lined up for summer 2013 in a few places including Nigeria." TechCorr Ex. 15. Later that month, on August 23, 2012, Robbe emailed Penney a representation agreement at the "James Gordon" email address, stating: "Hereby also the Representation Agreement, you will have to fil in Project details etc etc. Also the agreement should be betwen Hak en a friend of your as you said." TechCorr Ex. 11. The representation agreement was between a company called "Flowtech" and A.Hak for several tanks. Robbe Dep. 146-47. Robbe testified that he sent this agreement to Penney "[b]ecause as in the correspondence it is shown that the agreement should be with Gary Penney but instead of that he preferred Flowtech as the contractor party." Id. at 147. Also on August 23, 2012, Penney gave TechCorr a letter of resignation that was effectively immediately. TechCorr Ex. 9. The next day, Penney emailed Robbe from the "James Gordon" email address, stating: "I think it may be wise for me to sign the agreement personally - would you have any objection to this?" TechCorr Ex. 13. Robbe responded:

> My personnel opinion is that it should not be signed by you for a simple reason. You have a Non Compete Clause with TechCorr, so you should not be officially involved with us. If we do this, you are on paper and signed our Agent, I think we than make it too easy for TechCorr. I also remember you told me you wanted to do this in the name of a friend.

TechCorr Ex. 13.

On August 26, 2012, Penney sent a fax to ZADCO purporting to withdraw a bid TechCorr had submitted. TechCorr Ex. 12. Then, on September 2, 2012, an A.Hak employee emailed Penney, stating, among other things: "While waiting for ADMA and ZADCO to show their interest for the work to be carried in Tank Inspection, and in order to implement the various discussions you had with [Robbe] about several jobs outside the UAE, can we sit down together and put a plan on how to proceed with that?" TechCorr Ex. 20. The next day, David McGriff emailed Robbe, Michael O'Connell, and Silverman, writing: "[P]lease keep me up-dated on delays as soon I will need to put together a Mobilization time for the ADMA tanks if a.hak gets the contract. Gary has talked to ADMA and it can be delayed some if necessary but better not to plan for delays if possible as time goes fast." TechCorr Ex. 21. In his deposition, Robbe testified that Penney had disclosed to him that TechCorr was bidding on the ADMA job. Robbe Dep. 149.

Then, on September 5, 2012, Penney emailed Robbe asking: "Can you please try to contact Nigeria Dr. Agina as soon as you can." TechCorr Ex. 16. Robbe responded that an A.Hak employee, Berry Krijbolder, should contact Agina. TechCorr Ex. 17. On September 8, 2012, Krijbolder emailed Agina, stating: "We learned through Mr. Gary about the potential opportunities for our Tank Inspection services in your country Nigeria." TechCorr Ex. 18. On December 9, 2012, another A.Hak employee, Michael O'Connell, emailed Krijbolder following a visit to Nigeria. TechCorr Ex. 19. O'Connell stated, among other things: "I am confident that we will get approval for the technology to be used in Nigeria." Id. Finally, A.Hak never hired Penney. Robbe Dep. 137.

In light of the foregoing events, TechCorr alleges A.Hak tortiously interfered with Penney's contract and caused TechCorr to suffer $252,000 in lost profits due to a reduced

bid amount for a job with ADMA and $450,000 in lost profits due to the cancellation of a

tender made to ZADCO. TechCorr Ex. 25. In his deposition, Vincent Summa testified

about the ZADCO tender:

> [Summa:] We had spent several years investing in the UAE market and
> convinced ZADCO, which is also ExxonMobil, that they could use our in-
> service robotic technique to inspect their one million barrel oil tanks, and do
> it continuously on a routine maintenance basis. ZADCO went ahead and
> proceeded with the tender. TechCorr accepted it would participate in the
> tender. A.Hak didn't present anything, as far as I recall, and because of
> A.Hak trying to hire Gary Penney . . . submitted a fax to ZADCO, indicating
> TechCorr would no longer bid, and immediately after, A.Hak supplied a
> document, stating they were ready to participate.

> [Counsel:] Did -- did A.Hak bid ZADCO?

> [Summa:] ZADCO cancelled the project because of the issues that we
> currently have between our companies.

> [Counsel:] How do you know all the things that you just testified about?

> [Summa:] Because I specifically sat down with Manee there, and he also
> forwarded me the fax and e-mails from A.Hak, and also from Gary Penney,
> to ZADCO.

> . . .

> [Counsel:] So ZADCO cancelled the tender because of the lawsuit?

> [Summa:] Yes.

> [Counsel:] But where do you get the million dollar figure?

> [Summa:] It's actually more because it's probably a million a year, but a
> million is what that particular tender was for because we had discussions,
> prior to them going out to bid, on what the price would be.

Vincent Summa Dep. 124-27.

A.Hak argues it never employed Penney and, in any event, TechCorr did not incur

damages. TechCorr agrees A.Hak did not hire Penney, but argues that failure to hire is

immaterial to its claim. TechCorr also claims lost work with ADMA and ZADCO due to A.Hak's alleged interference with Penney's contract.

Because the parties agree that Penney and TechCorr had a contract, the latter three elements of this claim are at issue: whether A.Hak took "a willful and intentional act of interference with" Penney's contract, whether such an act "proximately caused" TechCorr's injury, and whether such an act "caused actual damages or loss." Prudential Ins. Co. of Am., 29 S.W.3d at 77. Viewing the evidence in the light most favorable to TechCorr, genuine issues of material fact as to each of these elements.

First, TechCorr submitted evidence of the correspondence between Robbe and Penney during and following Penney's employment that a reasonable juror could rely on to find this element satisfied. For example, the same day that Robbe emailed Penney an agreement where Penney would assist A.Hak by working for "Flowtech," Penney resigned from TechCorr. The next day, Penney and Robbe exchanged emails about the agreement. In those emails, Robbe stated he thought it would be "too easy for TechCorr" if Penney signed the agreement and referenced Penney's non-compete agreement. Moreover, as TechCorr points out, there is no requirement that A.Hak must have hired Penney. It is sufficient that A.Hak took some willful and intentional act to interfere with his contract. Thus, given the evidence of Robbe and Penney's interaction during and after Penney's employment with TechCorr and, in particular, Robbe's acknowledgment of Penney's non-compete clause, a genuine issue of material fact exists as to whether A.Hak willfully and intentionally interfered with Penney's contract.

A factual dispute also exists regarding proximate cause of damages. To prove proximate cause, TechCorr must show that A.Hak "took an active part in persuading"

33

Penney to breach his contract with TechCorr. <u>M-I LLC</u>, 733 F. Supp. 2d at 775. Evidence shows Penney and Robbe corresponded via email immediately before and after Penney left his employment with TechCorr concerning Penney entering into an agreement through which he would assist A.Hak. The nature and extent of the correspondence between Penney and Robbe could convince a reasonable juror that A.Hak played an active role in persuading Penney to breach his contract by leaving TechCorr and assisting A.Hak.

Finally, TechCorr offered sufficient evidence of actual damages to survive summary judgment. "'Preexisting profit figures, combined with evidence of relevant facts and circumstances, are sufficient to establish causation and the reasonably certain amount of damages.'" <u>Nova Consulting Grp., Inc. v. Eng'g Consulting Servs., Ltd.</u>, 290 F. App'x 727, 738 (5th Cir. 2008) (quoting <u>Univ. Computing Co. v. Mgmt. Sci. Am., Inc.</u>, 810 F.2d 1395, 1398 (5th Cir. 1987)). Thus, "[a]n established business' profits before the unfair competition (e.g. tortious interference), 'together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost.'" <u>Id.</u> (quoting <u>Sw. Battery Corp. v. Owen</u>, 115 S.W.2d 1097, 1098-99 (Tex. 1938)). Here, TechCorr produced evidence indicating it lost profits due to a reduced bid for a job with ADMA and a cancelled ZADCO tender. <u>See, e.g.</u>, TechCorr Ex. 25; Vincent Summa Dep. 124-27. Evidence could reasonably connect Penney and Robbe to ADMA and ZADCO during the relevant time period. It is undisputed that A.Hak acquired information that TechCorr had about ADMA and ZADCO from Penney. Robbe claimed A.Hak did not use this information. However, the September 2, 2012 email from an A.Hak employee and the September 3, 2012 from McGriff produced by TechCorr can reasonably be viewed as

contradicting that testimony since the emails refer to potential work with ADMA and ZADCO around the same time that Penney left TechCorr. In addition, Vincent Summa's testimony that Penney sent the false fax to withdraw the ZADCO bid played a role in ZADCO cancelling the tender also tends to show a genuine issue of fact. In light of the facts and circumstances most favorable to TechCorr, A.Hak's conduct reasonably caused TechCorr to suffered the averred damages. The Court therefore denies A.Hak's motion for summary judgment as to this claim. Accordingly, TechCorr's tortious interference claim concerning Gary Penney's contract survives summary judgment.

### c.   Current or Prospective Customer Relationships

TechCorr's final tortious interference claim alleges that A.Hak interfered with its relationships with current or prospective customers by using TechCorr's confidential information and trade secrets or making false or misleading statements. TechCorr's pleading does not enumerate the specific customers at issue.

A.Hak contends that this claim fails because TechCorr failed to show A.Hak used the information from Penney about ZADCO and ADMA to interfere with TechCorr's relationships with those entities. A.Hak further argues that TechCorr has no evidence of damages concerning this claim.

In response, TechCorr argues it has suffered the following lost profits due to A.Hak's tortious interference with the following alleged existing or potential customers:

- ZADCO: $450,000 due to cancellation of the tender;

- ADMA: $252,000 due to a reduced bid amount;

- TVA: $43,500 due to a cancelled purchase order;

- Exxon Torrence Refinery: $232,000 due to a lost job;

35

- Shell Martinez Refinery: $87,000 due to a lost job;

- Shell Brockville: $87,000 due to a lost job;

- AG Processing, Inc.: $ 17,102.46 due to a lost job; and

- DM Petroleum Operations Co.: $19,528.60 due to a lost job.

TechCorr Ex. 25.[9]  The Court will address the tortious interference claim as to each of these entities in turn.

### i.   ZADCO

The ZADCO cancelled tender presents a tortious interference with prospective contract claim as TechCorr alleges the tender was going to lead to a contract.  See Vincent Summa Dep. 124-27.  A.Hak contests the first, second, and fourth elements of this claim as follows: (1) no evidence shows a reasonable probability that A.Hak and ZADCO would have entered into a contract; (2) no evidence indicates A.Hak took an interfering act concerning ZADCO based on Robbe's testimony he did not use the ZADCO information and ZADCO cancelled the project due to this lawsuit; and (3) no evidence of damages exists.

Viewing all the evidence in the light most favorable to TechCorr, TechCorr produced evidence on which a reasonable juror could rely to find "a reasonable probability" TechCorr and ZADCO would have entered into a contract.  See Tex. Disposal Sys. Landfill, Inc., 219 S.W.3d at 590.  Vincent Summa testified TechCorr worked to establish a relationship with ZADCO that resulted in a tender.  Vincent Summa Dep. 124-

---

[9] TechCorr does not enumerate these entities in its response.  Instead, TechCorr cites Exhibit 25 when arguing that it has evidence of damages to support its tortious interference claims.

27. A reasonable juror could find that the tender indicates a reasonable probability that ZADCO would offer TechCorr a contract.

A genuine dispute of material fact exists concerning the second element. TechCorr offered sufficient evidence to support its tortious interference claim concerning Gary Penney's contract. That tortious interference claim, if proven, would qualify as an "independently tortious . . . act." See Tex. Disposal Sys. Landfill, Inc., 219 S.W.3d at 590. Moreover, TechCorr offered sufficient evidence connecting Penney, A.Hak, and ZADCO to convince a reasonable juror A.Hak interfered with Penney's contract to prevent TechCorr from obtaining a contract with ZADCO or interfered knowing it was substantially likely to happen. See id. Indeed, as discussed earlier, evidence shows A.Hak sought work with ZADCO after learning of it from Penney. Further, evidence shows Penney, while communicating with A.Hak, sent a false fax purporting to cancel TechCorr's bid on the ZADCO contract that played a role in ZADCO halting the project. A.Hak claims it never used the information about ZADCO or knew that Penney was going to try to withdraw TechCorr's bid. Thus, a genuine issue of material fact exists.

Finally, A.Hak again argues that TechCorr presents no competent evidence of damages concerning ZADCO. As stated above, TechCorr produced sufficient evidence to create a genuine issue of material fact as to whether A.Hak's conduct caused TechCorr to suffer damages concerning ZADCO. Accordingly, the Court denies the motion for summary judgment as to the tortious interference claim arising from the prospective ZADCO contract.

### ii. ADMA

Next, the ADMA bid reduction cannot give rise to a tortious interference with existing contract claim because TechCorr does not point to any actions of A.Hak that occurred after ADMA awarded TechCorr the contract. See Prudential Ins. Co. of Am., 29 S.W.3d at 77 (requiring that defendant took an action regarding "an *existing* contract" (emphasis added)). There is, however, sufficient evidence for a tortious interference with prospective contract claim to survive summary judgment. A reasonable juror could find that the fact that TechCorr received the contract indicates a reasonable probability that ADMA would have accepted TechCorr's higher bid. See Tex. Disposal Sys. Landfill, Inc., 219 S.W.3d at 590. A genuine dispute of material fact also exists regarding the second element, given A.Hak's alleged tortious interference with Penney's contract. See id. Similar to ZADCO, evidence connects Penney, A.Hak, and ADMA on which a reasonable jury could rely to find A.Hak interfered with Penney's contract to prevent TechCorr from obtaining the ADMA contract at a higher bid price or interfered knowing it was substantially likely to happen. For example, there is evidence showing Penney gave A.Hak information about ADMA and A.Hak then entered the ADMA bidding process. Finally, the Court has found that there is a genuine issue of material fact as to whether A.Hak's conduct caused TechCorr to suffer damages concerning ADMA. Accordingly, the Court denies the motion for summary judgment as to TechCorr's claim for tortious interference with prospective contract claim concerning the ADMA bid reduction.

### iii. TVA

Turning to the tortious interference claim concerning the TVA, TechCorr relies on a contract that the TVA cancelled. A.Hak argues that TechCorr cannot prove causation

concerning the TVA contract because no evidence links actions of A.Hak to the TVA's decision to cancel it. In making this argument, A.Hak relies on TechCorr's Exhibit 24. Exhibit 24 contains various emails and documents that concern a TVA robotic tank inspection project. These documents reveal the following facts about the TVA project, viewed in the light most favorable to TechCorr.

On May 30, 2012, Mike O'Connell of A.Hak emailed a TVA contract manager concerning a bid for a robotic tank inspection project. TechCorr Ex. 24. O'Connell asked the contractor manager questions about the contract. The contractor manager asked O'Connell to clarify his questions. O'Connell responded on May 31, 2012, stating:

> Basically you have included detailed performance criteria into a competitive bid, but have not provided for or requested proof that the bidders systems' can comply with the criteria.
>
> We are prepared and very capable of meeting all of your performance criteria. . . . To be fair, it is necessary to insure that all bidder's systems can meet and demonstrate all of the performance criteria...else you will be comparing apples to oranges.

Id. Later in the day on May 31, the contract manager emailed Vincent Summa requesting that TechCorr submit a narrative confirming its ability to meet various concerns of the TVA. Id. In this email, the contract manager also stated: "One of the competitors has implied that TechCorr's equipment can not meet the Specification." Id.

Vincent Summa responded to the TVA with the requested information on June 4, 2012. Id. The TVA offered TechCorr the contract on August 17, 2012. Id. TechCorr signed the contract on August 20, 2012. Id.

Then, on October 19, 2012, Vincent Summa emailed a TVA safety professional. His email referenced an upcoming conference call and discussed the status of various

documents that the TVA appears to have requested. Id. These documents concerned OTIS® procedure, a job safety analysis, training documents, and a letter from TechCorr. Id. The safety professional responded in an email to Summa. Her email quoted the FAQ question from TechCorr's website that states "OTIS is designed as an intrinsically safe system" and asked, "So if this is true, the equipment has gone through a third party to certify it is intrinsically safe?" Id. Summa responded and addressed her question. Also on October 19, O'Connell emailed an engineer with the TVA claiming that TechCorr was using "undocumented or uncertified electrical equipment" for the project and stating that doing so was likely a violation of an OSHA regulation. Id. The end of O'Connell's email details the services that A.Hak offers. In addition, earlier messages in the email chain, viewed in the light most favorable to TechCorr, indicate that O'Connell had previously discussed this issue with the TVA. Id.

Thereafter, on October 22, 2012, Vincent Summa forwarded an email to various TVA representatives from TechCorr's electronics expert. Id. The forwarded email discussed, among other things, an "intrinsic barrier" used by TechCorr as "the primary system that converts the signals intrinsically safe levels." Id. Finally, the parties agree that the TVA cancelled the contract.

A genuine issue of material fact exists as to proximate cause that precludes summary judgment on the tortious interference claim based on the TVA contract.[10] Undisputed evidence shows TechCorr and the TVA had a contract, which satisfies the first element. See Prudential Ins. Co. of Am., 29 S.W.3d at 77. Next, O'Connell's act of

---

[10] O'Connell's communications with the TVA cannot support an interference with prospective contract claim because these actions did not stop the TVA from awarding TechCorr the contract. See Tex. Disposal Sys. Landfill, Inc., 219 S.W.3d at 590.

emailing the TVA to claim that TechCorr's equipment violated an OSHA regulation can reasonably be viewed as an act intended to cause the TVA to cancel the contract.  See id.  Indeed, under Texas law, the interfering act concerning an existing contract need only be "willful and intentional."  See U.S. Enercorp, Ltd. v. SDC Mont. Bakken Exploration, LLC, 966 F. Supp. 2d 690, 705 (W.D. Tex. 2013) (collecting cases); Wal-Mart Stores, Inc. v. Sturges, 52 S.W.3d 711, 721 (Tex. 2001) (noting "the importance of decoupling interference with contract from interference with prospective relations, and of grounding liability for the latter in conduct that is independently tortious by nature or otherwise unlawful").  Finally, a reasonable juror could find that O'Connell's correspondence with the TVA proximately caused TechCorr to lose the contract.  See id.  A jury could reasonably find that O'Connell's email claiming TechCorr used "undocumented or uncertified electrical equipment" and including information about A.Hak's robotic tank inspection services persuaded the TVA to cancel the contract.  Indeed, the evidence that A.Hak offered "better terms or other incentives" to the TVA can prove proximate cause.  M-I LLC, 733 F. Supp. 2d at 775.  In addition, the evidence contradicts A.Hak's claims that the TVA's investigation and decision to cancel the contract was independent of O'Connell's actions.  Such a factual dispute is not properly resolved through summary judgment.  Accordingly, the Court denies the motion for summary judgment as to the tortious interference claim based on the TVA contract.

> iv.  **Exxon Torrence Refinery, Shell Martinez Refinery, Shell Brockville, AG Processing, Inc., and DM Petroleum Operations Co.**

Finally, A.Hak argues TechCorr cannot maintain a tortious interference claim concerning jobs lost with Exxon Torrence Refinery, Shell Martinez Refinery, Shell

Brockville, AG Processing, Inc., and DM Petroleum Operations Co. because TechCorr has not provided any evidence connecting such losses to any action by A.Hak.

A claim of tortious interference with a contract, whether existing or prospective, requires proof that the defendant took some act of interference. See Prudential Ins. Co. of Am., 29 S.W.3d at 77; Tex. Disposal Sys. Landfill, Inc., 219 S.W.3d at 590. TechCorr offered no evidence or argument showing that A.Hak took an action concerning these entities. Indeed, TechCorr did not produce any evidence with regard to the entities beyond merely listing each of them as a "lost job" without any supporting testimony or documentation of any kind. TechCorr Mem. Resp. at 22. An utterly unsupported factual claim cannot create a genuine issue of material fact regarding A.Hak's involvement. See Anderson, 477 U.S. at 247-48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ."). Accordingly, the Court grants summary judgment in A.Hak's favor as to the tortious interference with customers claim concerning Exxon Torrence Refinery, Shell Martinez Refinery, Shell Brockville, AG Processing, Inc., and DM Petroleum Operations Co.

Similarly, for lack of any supporting evidence, the Court grants summary judgment in A.Hak's favor to the extent that TechCorr seeks to hold A.Hak liable for tortious interference with existing or potential customers of TechCorr that are not listed in TechCorr's Exhibit 25.

In sum, five tortious interference claims survive summary judgment: (1) existing contract based on the right of first refusal; (2) existing contract based on Gary Penney's employment contract; (3) prospective contract based on the ZADCO tender; (4)

prospective contract based on the ADMA bid reduction; and (5) existing contract based on the TVA contract.

### 3. False Advertising

TechCorr makes a false advertising claim under the Lanham Act. A.Hak's website states: "Our third-generation OTIS inspection robots can be found nowhere else in this world." A.Hak argues this statement is not actionable because "third-generation" is not a statement of fact concerning the OTIS® robot. In response, TechCorr claims A.Hak is incorrect and then argues that a statement made by a BSI employee to the TVA supports this claim.

First, the Court considers the "third-generation OTIS inspection robots" statement. To be actionable under section 43(a) of the Lanham Act, the challenged statement must be "one of fact." Pizza Hut, Inc. v. Papa John's Int'l, Inc., 227 F.3d 489, 495-96 (5th Cir. 2000). A statement "of general opinion" is not actionable. Id.; see also Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc., 948 F. Supp. 2d 538, 553 (D. Md. 2013). Thus, "[f]or a statement to be actionable, it must be a 'specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact.'" Metro. Reg'l Info. Sys., Inc., 948 F. Supp. 2d at 553 (quoting Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co., 173 F.3d 725, 731 (9th Cir.1999)). Here, TechCorr provides no evidence or argument showing how "third-generation" or any other portion of this statement is one of fact. Thus, this statement is not actionable under the Lanham Act.

The alleged BSI employee's statement cannot support a claim because A.Hak did not make it. See PBM Prods., LLC, 639 F.3d at 120 (requiring that defendant made the

statement at issue).  Accordingly, the Court grants A.Hak's motion for summary judgment as to the false advertising claim.

### 4.    Declaratory Judgment

Next, A.Hak seeks summary judgment on TechCorr's declaratory judgment claim. This claim seeks three declarations: (1) "that the right of first refusal, the perpetual license, and the support obligations are valid and enforceable"; (2) "that the sale of the IP is void, or in the alternative, that it was against TechCorr's superior right to the sale"; and (3) "that the acts complained of herein constitute tortious interference and Lanham Act violations." TechCorr's Second Am. Countercls. ¶¶ 115-17.

"[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." Wilton v. Seven Falls Co., 515 U.S. 277, 282 (1995).  Thus, "[i]n the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." Id. at 288.

"Under Fourth Circuit precedent, a district court may decline to entertain a declaratory judgment claim when it has 'good reason' to do so." Metra Indus., Inc. v. Rivanna Water & Sewer Auth., Civil Action No. 3:12CV00049, 2014 WL 652253, at *2 (W.D. Va. Feb. 19, 2014) (citing Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., 386 F.3d 581, 594 (4th Cir. 2004)).  When considering "whether to exercise declaratory jurisdiction, the court must consider whether declaratory relief would 'serve a useful purpose in clarifying and settling the legal relations in issue,' and whether the judgment would 'terminate and afford relief from the uncertainty, insecurity, and controversy giving

44

rise to the proceeding.'" Id. (quoting Volvo Const. Equip. N. Am., Inc., 386 F.3d at 594).

Moreover, it is proper to dismiss a declaratory claim that "is duplicative in that it seeks no relief that is not implicitly sought in the other causes of action." Sofi Classic S.A. de C.V. v. Hurowitz, 444 F. Supp. 2d 231, 249 (S.D.N.Y. 2006). This occurs when a "declaratory judgment claim seeks resolution of legal issues that will, of necessity, be resolved in the course of the litigation of the other causes of action." Id. For example, "courts have repeatedly recognized that '[a] declaratory judgment serves no useful purpose when it seeks only to adjudicate an already-existing breach of contract claim.'" Metra Indus., Inc., 2014 WL 652253, at *2 (quoting Torchlight Loan Servs., LLC v. Column Fin., Inc., Civil Action No. 11 Civ. 7426, 2012 WL 3065929 (S.D.N.Y. July 25, 2012) and collecting cases).

The instant declaratory judgment claim substantially duplicates TechCorr's other claims. First, the claim for a declaration concerning the right of first refusal, perpetual license, and support obligations will be resolved through the course of this litigation. This declaration therefore is duplicative. Second, a declaration that the sale of the IP to A.Hak is void or was against TechCorr's superior right to the sale also duplicates TechCorr's other claims. The same is true for the declaration with respect to the tortious interference claims and violations of the Lanham Act. Accordingly, allowing duplicative declaratory judgment claims to proceed will not serve a useful purpose in resolving disputed issues. The Court therefore grants summary judgment in A.Hak's favor on the declaratory judgment claims.

## 5.    Trade Secret Misappropriation

A.Hak also seeks summary judgment on TechCorr's trade secret misappropriation claim.  TechCorr alleges the following are trade secrets that A.Hak misappropriated:

- Proposal for ADMA that included scope of work, cost estimates, and price;

- Proposal for ZADCO that included scope of work, cost estimates, and price;

- Short-range guided wave bid prepared for TechCorr; and

- Opportunity in Nigeria relayed to A.Hak by Gary Penney.

TechCorr Mem. Resp. at 21-22.  A.Hak denies that any of TechCorr's information that it received constituted a trade secret and contends that, even if the information constituted a trade secret, it did not use any of the information.  A.Hak Mem. Supp. Mot. Partial Summ. J. & Mot. Summ. J. at 22-23 & n.58.

To maintain a trade secret misappropriation claim under Texas law, a plaintiff must prove that "a trade secret exists."  Gen. Universal Sys., Inc. v. HAL, Inc., 500 F.3d 444, 449 (5th Cir. 2007).  The Supreme Court of Texas has "held that a trade secret is any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it."  In re Bass, 113 S.W.3d 735, 739 (Tex. 2003) (citation and quotation marks omitted). Texas courts weigh six factors to determine if a trade secret exists:

> (1) the extent to which the information is known outside of his business;
>
> (2) the extent to which it is known by employees and others involved in his business;
>
> (3) the extent of the measures taken by him to guard the secrecy of the information;
>
> (4) the value of the information to him and to his competitors;

46

(5) the amount of effort or money expended by him in developing the information; and,

(6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Id. "[T]he party claiming a trade secret should not be required to satisfy all six factors because trade secrets do not fit neatly into each factor every time." Id. at 740.

Here, TechCorr failed to offer evidence showing a trade secret. TechCorr does not address any of the six factors relevant to this analysis. At most, in its response, TechCorr describes the information A.Hak allegedly used as "confidential" by stating "A.Hak did misuse confidential information." TechCorr Mem. in Resp. at 21-22. Information, however, must be more than confidential to support a misappropriation of trade secrets claim. See, e.g., Guy Carpenter & Co. v. Provenzale, 334 F.3d 459, 468 (5th Cir. 2003) (holding that customer list was not a trade secret despite contract stating the list was confidential); Stewart & Stevenson Servs., Inc. v. Serv-Tech, Inc., 879 S.W.2d 89, 99 (Tex. App.-Houston [14th Dist.] 1994). Indeed, "there is no cause of action for misappropriation of confidential information that is not either secret or, at least substantially secret." Stewart & Stevenson Servs., Inc., 879 S.W.2d at 99. Moreover, to the extent this information may relate to TechCorr's customers, trade secret status does not "automatically attach[] to any information that a company acquires regarding its customers." Trilogy Software, Inc. v. Callidus Software, Inc., 143 S.W.3d 452, 466-67 (Tex. App.-Austin 2004). Because TechCorr has not provided any evidence of a trade secret, no genuine issue of material fact exists as to TechCorr's trade secret

misappropriation claim. Accordingly, the Court grants summary judgment in A.Hak's favor on this claim.

### 6. Aiding and Abetting

In its aiding and abetting claim, TechCorr alleges A.Hak aided and abetted Gary Penney's wrongful conduct. A.Hak argues TechCorr has no competent evidence of damages. A.Hak Mem. Supp. Mot. Partial Summ. J. & Mot. Summ. J. at 23-24. For the reasons the Court previously found TechCorr offered sufficient evidence to create a genuine issue of material fact on damages arising from its claims concerning A.Hak's involvement with Penney, the Court denies the motion for summary judgment as to the aiding and abetting claim.

### 7. Cancellation of Trademark Registrations

Next, A.Hak seeks summary judgment on the cancellation of trademarks claim. TechCorr responds that it is no longer pursuing this claim because the A.Hak parties have admitted it has a license. Accordingly, because TechCorr withdrew this claim, the Court denies, as moot, the motion for summary judgment as to this claim.

### 8. Conspiracy

TechCorr's final claim is a conspiracy claim. This claim alleges that BSI, Silverman, and A.Hak conspired to commit the acts alleged in TechCorr's other claims.

Under Texas law, a civil conspiracy claim requires proof of five elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." Tri v. J.T.T., 162 S.W.3d 552, 556 (Tex. 2005). "The concept of civil conspiracy is sometimes used by an injured plaintiff as a basis for establishing joint and

several tort liability among several parties." Carroll v. Timmers Chevrolet, Inc., 592 S.W.2d 922, 925-26 (Tex. 1979). "[C]ivil conspiracy came to be used to extend liability in tort . . . beyond the active wrongdoer to those who have merely planned, assisted, or encouraged his acts." Id. (citation and quotation marks omitted). Thus, "[c]onspiracy is a derivative tort because 'a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable.'" W. Fork Advisors, LLC v. SunGard Consulting Servs., LLC, 437 S.W.3d 917, 920 (Tex. App.-Dallas 2014) (quoting Tilton, 925 S.W.2d at 681). Indeed, "there can be no independent liability for civil conspiracy." Id. (citation omitted).

Here, the tortious interference claim could support TechCorr's conspiracy claim. A conspiracy claim, however, seeks to hold a defendant liable for a tort that she did not actually commit but assisted through her actions. See Carroll, 592 S.W.2d at 925-26. TechCorr cannot bring an independent cause of action against A.Hak for civil conspiracy. See id. In this case, A.Hak is the alleged tortfeasor. This conspiracy claim therefore is improper. Accordingly, the Court grants A.Hak's motion for summary judgment as to the civil conspiracy claim.

### IV. Conclusion

For the foregoing reasons, the Court **DENIES** the Motion for Partial Summary Judgment and **GRANTS IN PART** the Motion for Summary Judgment. In granting the Motion for Summary Judgment in part, the Court makes the following rulings.

The Court **GRANTS** the Motion for Summary Judgment as to Count One - Breach of Contract.

The Court **GRANTS IN PART** the Motion for Summary Judgment as to Count Two - Tortious Interference.  Specifically:

- The Court **DENIES** the Motion for Summary Judgment as to Count Two - Tortious Interference with the alleged right of first refusal, which is specifically alleged in paragraph 95 of TechCorr's second amended counterclaims;

- The Court **DENIES** the Motion for Summary Judgment as to Count Two - Tortious Interference with the employment contract and/or employment relationship between TechCorr and Gary Penney, which is specifically alleged in paragraph 98 of TechCorr's second amended counterclaims;

- The Court **GRANTS** the Motion for Summary Judgment as to Count Two - Tortious Interference with the employment contract and/or employment relationship between TechCorr and Mike King, Ron Charles, David McGriff, Jeff Robbins, and others, which is specifically alleged in paragraph 98 of TechCorr's second amended counterclaims;

- The Court **DENIES** the Motion for Summary Judgment as to Count Two - Tortious Interference concerning TechCorr's prospective contract with ZADCO that is reflected in TechCorr's Exhibit 25 as "ZADCO - cancelled tender" and specifically alleged in paragraph 96 of TechCorr's second amended counterclaims, but the Court **GRANTS** the Motion for Summary Judgment as to this claim to the extent TechCorr seeks to hold A.Hak liable for tortious interference with an existing contract;

- The Court **DENIES** the Motion for Summary Judgment as to Count Two - Tortious Interference concerning TechCorr's prospective contract with ADMA that is

reflected in TechCorr's Exhibit 25 as "ADMA - reduced bid amount" and specifically alleged in paragraph 96 of TechCorr's second amended counterclaims, but the Court **GRANTS** the Motion for Summary Judgment as to this claim to the extent TechCorr seeks to hold A.Hak liable for tortious interference with an existing contract;

- The Court **DENIES** the Motion for Summary Judgment as to Count Two - Tortious Interference concerning TechCorr's existing contract with the Tennessee Valley Authority that is reflected in TechCorr's Exhibit 25 as "Tennessee Valley Authority - cancelled PO" and specifically alleged in paragraph 96 of TechCorr's second amended counterclaims, but the Court **GRANTS** the Motion for Summary Judgment as to this claim to the extent TechCorr seeks to hold A.Hak liable for tortious interference with a prospective contract;

- The Court **GRANTS** the Motion for Summary Judgment as to Count Two - Tortious Interference concerning TechCorr's existing or prospective contract with Exxon Torrence Refinery that is reflected in TechCorr's Exhibit 25 as "Exxon Torrence Refinery - lost job" and specifically alleged in paragraph 96 of TechCorr's second amended counterclaims;

- The Court **GRANTS** the Motion for Summary Judgment as to Count Two - Tortious Interference concerning TechCorr's existing or prospective contract with Shell Martinez Refinery that is reflected in TechCorr's Exhibit 25 as "Shell Martinez Refinery - lost job" and specifically alleged in paragraph 96 of TechCorr's second amended counterclaims;

- The Court **GRANTS** the Motion for Summary Judgment as to Count Two - Tortious Interference concerning TechCorr's existing or prospective contract with Shell Brockville that is reflected in TechCorr's Exhibit 25 as "Shell Brockville - lost job" and specifically alleged in paragraph 96 of TechCorr's second amended counterclaims;

- The Court **GRANTS** the Motion for Summary Judgment as to Count Two - Tortious Interference concerning TechCorr's existing or prospective contract with AG Processing, Inc. that is reflected in TechCorr's Exhibit 25 as "AG Processing, Inc. - lost job" and specifically alleged in paragraph 96 of TechCorr's second amended counterclaims;

- The Court **GRANTS** the Motion for Summary Judgment as to Count Two - Tortious Interference concerning TechCorr's existing or prospective contract with DM Petroleum Operations Co. that is reflected in TechCorr's Exhibit 25 as "DM Petroleum Operations Co - lost job" and specifically alleged in paragraph 96 of TechCorr's second amended counterclaims; and

- The Court **GRANTS** the Motion for Summary Judgment as to Count Two - Tortious Interference concerning TechCorr's existing or prospective contract with any other consumer that is not listed in TechCorr's Exhibit 2.

The Court **GRANTS** the Motion for Summary Judgment as to Count Four - Lanham Act Violations.

The Court **GRANTS** the Motion for Summary Judgment as to Count Five - Declaratory Judgment.

The Court **GRANTS** the Motion for Summary Judgment as to Count Six - Trade Secret Misappropriation.

The Court **DENIES** the Motion for Summary Judgment as to Count Seven - Aiding and Abetting.

The Court **DENIES AS MOOT** the Motion for Summary Judgment as to Count Eight - Cancellation of Trademark Registrations because TechCorr has withdrawn this claim.

The Court **GRANTS** the Motion for Summary Judgment as to Count Nine - Conspiracy.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED:** December 18, 2014

GINA M. GROH
UNITED STATES DISTRICT JUDGE